## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **RODNEY DEAN FREEMAN,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:14-CV-2036-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant** | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

The claimant filed applications for disability insurance benefits and supplemental security income in September 2010 and August 2010, respectively. (R. 100-111). The claimant alleged disability beginning October 19, 2008, because of attention deficit/hyperactivity disorder (ADHD), anxiety, and depression. (R. 98-99). The Commissioner denied both applications on March 16, 2011. (R. 118-127). In a decision dated November 27, 2012, the ALJ found the claimant not disabled. (R. 22-40, 45-97). The Appeals Council denied the claimant's request for review. (R. 5-10). The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review: 1) whether the ALJ erred in applying less weight to the opinions of the two psychological examiners, Dr. Alan Blotcky, Ph.D.

and Dr. Donald Blanton, Ph.D.; 2) whether the ALJ erred in finding the claimant's allegations of disabling mental impairments not credible.

### III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if she applied the correct legal standards and if substantial evidence supports the factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker,* 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo.* The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206,

1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker,* 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of the evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

### IV. LEGAL STANDARD

Under 42 U.S.C. §423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...". 42 U.S.C. §423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subtpt. P, app. 1?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

3

The ALJ may reject the opinion of *any* physician when the evidence supports a contrary conclusion. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (emphasis added). The ALJ must consider all medical opinions, but does not have to accord an opinion arising out of a single consultative examination the special deference he must give to a treating physician's opinion. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997).

The ultimate issue of disability is left to the determination of the Social Security Commissioner and the statement by a medical source that a claimant is "disabled' is not binding. 20 C.F R. § 404.1527 (e). The ALJ may give substantial weight to the medical opinion of a claimant's treating physician, but the ALJ is not forced to base his conclusion on the determination of disability by a physician or outside entity. *Symonds v. Astrue*, 448 Fed. Appx. 10, 12 (11th Cir. 2011).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from that condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R. § 404.1529. The ALJ must articulate reasons for discrediting the claimant's subjective testimony. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991).  The ALJ may consider a claimant's daily activities in evaluating and discrediting complaints of disabling pain.  *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

## V. FACTS

The claimant was fifty-three years old at the time of the administrative hearing.  (R. 40, 53, 100).  The claimant has a GED, and past work experience as a pest control technician and security guard. (R. 53, 54, 82).  The claimant alleged disability beginning in October 2008 because of depression, ADHD, lower back problems, anger, discomfort around people, bad thoughts about death, high anxiety in public, nightmares about death, constant worry that someone will get hurt, memory loss, inability to cope with stress because of his job,  high cholesterol, hypertension, and sleep problems.  (R. 181).

### *Limitations*

The medical evidence on record reveals that the claimant complained to Nolan Hudson, M.D., a general internist, on June 14, 2007 of difficulty concentrating and staying focused on one task until completion.  Dr. Hudson diagnosed ADD and prescribed Adderall for treatment.  (R. 246).  On September 14, 2007, the claimant received a refill of Adderall for his ADD.  (R. 238). Dr. Hudson instructed the claimant to continue taking Valium for chronic general anxiety.  (R. 239).  The claimant saw Dr. Hudson again on November 30, 2007 for hyperlipidemia (high number of lipids/fats in the blood) and hypertension.  (R. 240).  Dr. Hudson added a diagnosis of depressive disorder to the claimant's medical records.  (R. 241).

The claimant returned to Dr. Hudson on February 8, 2008 reporting continued anxiety and depression because of mine blasting near his home.  (R. 244).  Dr. Hudson instructed the claimant to continue taking his already prescribed Adderall for ADHD, Valium for anxiety, and Lexapro for depression.  (R. 244-245).  On May 19, 2008, the claimant attended a follow-up

appointment with Dr. Hudson, at which he complained of back pain.  (R. 252).  Dr. Hudson

reported that he cautioned the claimant regarding the amount of medication he was taking.  (R.

255).  The claimant continued to see Dr. Hudson for routine follow-ups for the remainder of

2008 and into 2009.  (R. 256-274).

According to the record, on March 22, 2010, Dr. Hudson reported that the claimant was

under a severe amount of stress, because his wife was ill and he had lost his job, causing

problems with depression, anxiety, and insomnia .  (R. 277).  Dr. Hudson instructed the claimant

to continue on his regular medications for anxiety, ADD, and depression.  (R. 276).

On January 22, 2011, at the request of the DDS, the claimant presented for a consultative

examination with Dr. Sharman Sanders, a neurologist (R. 318).  The claimant complained of

being unable to concentrate, suffering from vivid flashbacks, and experiencing "aching all over."

(R. 318).  The claimant was also concerned that he might be developing Alzheimer's dementia.

The claimant was diagnosed with ADD and was prescribed Adderall.  The claimant refused to be

evaluated for surgery or have any back scans.  The claimant stated that the flashbacks did not

affect his concentration.  During the examination, Dr. Sanders observed the claimant walk

without assistance, sit comfortably, get on and off the exam table with ease, and take his shoes

off and put them back on independently.  Dr. Sanders recommended neuropsychiatric testing.

(R.318-321).

On January 28, 2011, the claimant sought treatment at Birmingham Health Care,

requesting an examination for "disability."  Lumbar spine x-rays revealed "no significant lumbar

spine abnormality." (R. 324).

At the request of the SSA, Alan Blotcky, Ph.D., a psychologist, evaluated the claimant on February 1, 2011.  During the examination, the claimant reported that he was unable to work because of depression, anxiety, and ADHD.  (R. 326).  The claimant also reported that he quit school in the 9th grade. The claimant further reported spending most of his time doing light housework, preparing simple meals, and watching TV. The claimant reported that he had allowed his driver's license to expire.  (R. 325-329).

Dr. Blotcky conducted a mental status examination and diagnosed the claimant with depressive disorder, anxiety disorder, and borderline intellectual abilities.  Dr. Blotcky assigned the claimant a Global Assessment of Function (GAF) score of 42.  (R. 327-328).  Dr. Blotcky noted that, during the evaluation, the claimant was alert, responsive, and cooperative, and did not appear lethargic or drowsy.  Dr. Blotcky further noted that while he was irritable and easily agitated, the claimant's attention and concentration were "fairly good," his memory was "fair," and his abstract thinking was "poor."  Dr. Blotcky estimated that the claimant's intellectual abilities fell in the borderline range.  Dr. Blotcky also noted that the claimant reported that he was fired from job as a security officer at the hospital in 2004 because of an argument with a family while working there. (R. 328).

The record contains an opinion from State Agency psychologist Guendalina Ravello, Ph.D., dated February 28, 2011, based on his review of the claimant's file.  (R. 350).  Dr. Ravello made the following observation: "I think due to the chronicity of the problems, not getting any better, since 2008, even with medication he could have a chance for an allowance, but we need more objective evidence." (R. 350).

7

On March 9, 2011, State Agency psychologist Dale Leonard, Ph.D. completed a Psychiatric Review Technique Form and a Mental RFC Assessment in which he indicated that the claimant had moderate limitations in various areas of work-related mental functioning. (R. 331-348).

The claimant visited Gardendale Physician Associates on April 14, 2011, for a blood pressure check and a change in his depression medication. (R. 355-400). The claimant denied any cardiovascular symptoms, unusual fatigue, changes in weight, headaches, and visual disturbances. Review of musculoskeletal problems noted "no back pain, no joint pain, no neck pain." The claimant denied anxiety or insomnia, but endorsed depression symptoms. The claimant admitted smoking one pack of cigarettes per day and drinking 1-2 beers per week. The treatment records reflect that the claimant's motor and sensory function was normal, as was the claimant's mental status. The physician recorded a diagnosis of chronic depression and advised the claimant to continue taking Lexapro. The claimant was also prescribed Vytorin, Lotensin, and Restoril. (R. 355-400).

Through referral by his attorney, the claimant underwent a psychological evaluation with Donald W. Blanton, PhD on June 16, 2011. (R. 351-354). The claimant reported continuous depression and very poor memory. (R. 351). The claimant described having emotional problems, because his mother was "killed" in a hospital in the 1990's. The claimant also reported some improvement with his depression with Lexapro, but stated he could no longer afford the medication. The claimant reported that he received treatment from his family physician, but had not undergone any mental health care. The claimant reported to Dr. Blanton about quitting school in the 10th grade, but that, after three attempts, he successfully passed the GED. (R. 351-352).

8

In addition to a mental status examination, Dr. Blanton conducted memory testing and achievement testing.  (R. 352-353).  Pursuant to these tests, Dr. Blanton found evidence of "dementia possibly due to Alzheimer's disease"; he also diagnosed the claimant with a pain disorder, anxiety and depression, and assigned a GAF score of 45.  (R. 353-354).  Dr. Blanton also noted that he believed that the claimant's condition would likely deteriorate if placed under the stress of a job.  (R. 354).

The record shows that the claimant continued regular treatment (check-ups) with Dr. Hudson, from April 12, 2011 through November 1, 2012.  (R. 355-400).  On April 5, 2012, the claimant reported feelings that "everyone is out to get him" and that he may be bipolar.  Dr. Hudson observed that the patient "appears to have some psychiatric issues" and referred him to psychiatry.  (R. 370, 375). The claimant reported he was "trying to get on disability because of his chronic back pain."  Dr. Hudson diagnosed the claimant with hyperlipidemia, general anxiety, erectile dysfunction, tobacco abuse, depression, ADD, benign hypertension, GERD, insomnia, urinary frequency, and low back pain.  Dr. Hudson prescribed Tylenol with codeine (pain), Mobic (pain), Lortab (pain), Restoril (insomnia), Nexium (acid reflux), Lotensin (blood pressure), Adderall, Celexa (antidepressant), Cialis (ED), Valium (anxiety), and Vytorin (cholesterol).  (R. 374-375).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for supplemental security income, the claimant requested and received a hearing before an ALJ on November 6, 2012.  (R. 56).  At the hearing, the claimant testified that he experiences flashbacks and nightmares from things he observed while working as a security guard at Children's Hospital.  (R. 56).  The claimant also

9

testified that he had problems getting along with supervisors while working at Children's Hospital and that he experiences panic attacks, paranoia, and difficulties with memory and concentration.  (R. 62, 64, 68).

The claimant testified that he experiences thoughts of suicide and feelings of worthlessness.  The claimant stated he has taken medication for depression as long as he can remember.  (R. 79).  He also testified that he forgets things quickly, loses his train of thought, has trouble remembering people's names, and feels he may be developing Alzheimer's.  (R. 68).  The claimant testified he must alternate between sitting and standing throughout the day.  (R. 68).

According to his testimony, he does not have any energy until he takes his medications. The claimant stated he does not go shopping because he is afraid he will get in trouble as he has a short fuse and worries that someone will "say the wrong thing to him."  He has a driver's license, but doesn't drive because he gets nervous on the interstate.  The claimant testified that he suffers from panic attacks, gets really nervous, and worries he is going to go "over the edge" crazy but talks to God to calm himself down.  (R. 60-67).

During the hearing, the claimant testified that he believes he is developing Alzheimer's disease.  His father used to beat him for not listening, but the claimant explained that the real problem was that he suffered from undiagnosed ADHD.  His mother was killed in the hospital about eight years ago when she was given the wrong medications and the attending physicians tried to cut her throat to create an airway.  His mother's death still bothers him to this day.  (R. 63-64).

The claimant testified that he suffers from paranoia.  He believes people are out to get him, and he is in a constant state of alertness.  (R. 64-65).  His depression causes him to not care about anything. (R. 66).  Furthermore, he no longer has any hobbies.  (R. 69).

During the hearing, the claimant stated that he suffers low back pressure, like a muscle wound, and that he takes medication four times a day, including Valium, Codeine, and Mobic.  He felt the medication helped "some." His back pain during the hearing was 8/10.  (R. 70-71).

At the hearing, the claimant testified he did not seek psychiatric treatment as recommended by his treating physician, but that he underwent consultation with Dr. Blanton.  He has not undergone any counseling because "I don't talk.  I keep everything inside."  He has not undergone physical therapy for his back since he stopped working.  (R. 79-80).

The claimant testified that he currently suffers a torn tendon in his shoulder, and that he could not lift more than a gallon of milk or a small plastic bag of groceries.  He could stand "quite a while if my mind wanders" for about an hour.  The claimant further testified that engaging in employment is in "no way possible."  The claimant stated he would "go crazy" sitting at a desk.  (R. 83-84).

The vocational expert testified that the claimant's past relevant work history consisted of pest control, security guard, and patient transport.  (R. 87).  The ALJ asked the vocational expert a series of hypothetical questions, and in response to the hypotheticals, the expert testified that the hypothetical individual, with the claimant's limitations, could perform the following jobs available in the economy:  "vegetable harvester, " for which there were 400 positions in the state economy and 233,280 positions nationally; any job in the field of "laundry," with 2,509 positions in the state and 201,180 positions nationally;  "housekeeper," with 2,210 positions in the state

and 132,291 positions nationally; and "product assembler," with 2,300 positions in the state and 229,240 positions nationally. (R. 87-91).

*The ALJ Decision*

On November 27, 2012, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 22). First, the ALJ found that the claimant met the insured status requirements through December 31, 2012. Second, the ALJ found that the claimant had not engaged in substantial gainful activity since October 19, 2008, the alleged onset date. (R. 27).

Third, the ALJ found that the claimant suffered from three severe impairments: attention deficit disorder (ADD/ADHD), anxiety disorder, and depressive disorder. (R. 27). The ALJ also noted the claimant's alleged suffering from chronic low back pain, joint pain in his fingers, and left shoulder tear. The ALJ found that the record did not offer sufficient evidence to support an impairment related to the claimant's back pain; thus, the ALJ did not establish it as a medically determinable severe impairment. (R. 27). The ALJ further stated that the State agency medical consultant's reports supported this finding. (R. 27). The ALJ further concluded that the record did not support the claimant's complaints of joint pain: the claimant did not report his pain to his treating physician, nor did he report his pain during his consultative examination in February of 2011 with Dr. Blotcky. (R. 28). The ALJ also stated that the medical evidence did not confirm the claimant's allegations of a shoulder tear. (R. 28).

The ALJ noted that the claimant alleged suffering of Alzheimer's and that the consultative physician diagnosed dementia. The ALJ found the medical evidence, including

12

available testing, insufficient to support a diagnosis of either dementia or Alzheimer's.  The ALJ pointed out that the claimant's reports of memory problems were inconsistent, and that no evidence exists that the claimant reported problems with memory or concerns that he might suffer from Alzheimer's or dementia to his treating physician.  The ALJ found that the claimant's allegations of memory problems lacked credibility, and found such allegations did not justify finding a severe impairment related to the claimant's complaints. (R.29).

Fourth, the ALJ found that the claimant did not have an impairment or combination of impairments that met or medically equaled a listing.  The ALJ stated that the medical evidence did not indicate the claimant had repeated episodes of decompensation, was highly likely to decompensate with minimal increases in mental demands, or was unable to live outside a specialized facility, nor did any evidence show that the claimant was unable to function independently outside of his home.  (R. 29).

The ALJ considered the entirety of the record to evaluate the claimant's subjective complaints, including pain and mental state, using a two-step process.  First, the ALJ determined "whether there is an underlying medically determinable physical or mental impairment...that can be shown by medically acceptable clinical and laboratory diagnostic techniques - that could reasonably be expected to produce the claimant's pain or other symptoms."  Second, when a physical or mental impairment is present that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ "must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms."  The ALJ stated that when no objective medical evidence exists, the ALJ must make a determination based on credibility of the statements, while considering the record as a whole.  (R. 29-30).

13

The ALJ determined that the claimant's medical history and the medical opinions did not constitute adequate medical evidence of disability. The ALJ found that the claimant had medically determinable impairments that could cause his pain; however, he did not find the claimant's statements regarding the severity of his pain credible. First, the ALJ noted that the claimant's symptoms were inconsistent with the residual functional capacity assessment. The ALJ found that overall the claimant's impairments did not appear to prevent him from engaging in work activity. The ALJ noted that the claimant alleged suffering back pain for many years, yet he continued to perform work. The ALJ also noted that, while the claimant has alleged suffering depression and anxiety for many years, he had the ability to continue work. (R. 35-36). The ALJ also noted that the claimant cares for his own grooming and hygiene and manages his own finances. (R. 35).

Next, the ALJ noted that the claimant's symptom reports of symptoms varied with inconsistent reports made to his treating sources and the consultative examiners. Specifically, the ALJ noted that, during the consultative examination in January 2011 with Dr. Sanders, the claimant complained of suffering memory problems, but did not report those symptoms to his treating physicians and had never independently sought neuropsychological testing or other testing for dementia. The ALJ recognized that the only psychological examination the claimant sought independent of that scheduled by the SSA came at the prompting of his attorney, not as a referral from his treating source. (R. 36).

Regarding the claimant's work activity, the ALJ also noted that the claimant's reports were inconsistent. In support of this determination, the ALJ noted that the claimant reported to Dr. Sanders that he stopped working in 2007, and reported to Dr. Blotcky that he stopped

14

working in 2004, but records show he worked until 2008; the claimant reported to Dr. Sanders that he quit working because of stress, but he told Dr. Blotcky he was fired from his job because of an argument with a family at the hospital where he was working at the time. The ALJ noted that, during the hearing, the claimant initially testified that he quit working because of PTSD like symptoms caused by seeing dead children, body parts, and other traumatic things at work, but later testified that he was fired after having problems with his supervisors. (R. 36).

Furthermore, the ALJ noted that the claimant reported significant symptoms of depression and anxiety to his consultative examiners and during the hearing, but he did not report symptoms of the same severity to his treating physician. Furthermore, the ALJ noted that the claimant failed to seek recommended psychiatric treatment or counseling. The ALJ concluded that the claimant's depression and anxiety appeared to be mostly situational, worsening when his wife was ill and when he lost his job. The ALJ concluded that, outside of these situations, the claimant's symptoms appeared to be stable, based on reports made to his treating physician and the fact that his medications only changed slightly over the course of treatment. Consequently, the ALJ determined that the inconsistences between the medical record and the claimant's allegations and testimony severely undermined the claimant's credibility. (R. 36).

Finally, the ALJ analyzed the medical opinions in the record. The ALJ noted that the State agency medical consultants opined that the claimant's alleged physical problems were not severe. The ALJ further noted that the State agency psychological consultants opined that the claimant's ADHD, depressive disorder, and anxiety disorder resulted in moderate limitations in functioning. The ALJ found the State agency opinions well reasoned, well explained, and well supported by the medical evidence of record; thus, the ALJ gave their findings great weight.

15

The ALJ gave "great weight" to the opinion of Dr. Sanders, the State agency consultant. The ALJ noted that, while Dr. Sanders did not offer any opinions on the claimant's function capacity, Dr. Sanders did not diagnose any impairments that would justify the claimant's complaints of disabling back pain or joint pain.

The ALJ gave little weight to the opinion of Alan Blotcky, Ph.D. The ALJ noted that the claimant's subjective complaints of both mental and physical symptoms varied greatly between his January 2011 examination with Dr. Sanders and his February 2011 examination with Dr. Blotcky, rendering the claimant's complaints less credible. The ALJ acknowledged that Dr. Blotcky's findings relied heavily on the claimant's subjective complaints, as well as the claimant's presentation as angry and anxious. After noting the claimant did not exhibit those traits during his January 2011 examination or during contact with the State agency in March 2011, the ALJ deemed Dr. Blotcky's examination inconsistent with the claimant's normal presentation and other medical records. (R. 37).

The ALJ gave "less weight" to the evaluation of Donald Blanton, Ph.D. The ALJ noted that the claimant received no testing for memory problems and only reported such problems with his memory during his psychological evaluation with Dr. Blanton, after application for benefits. The ALJ found that no brain CT scans, MRIs, or specific neuropsychological testing supported the conclusions of Dr. Blanton. The ALJ concluded that the objective medical evidence did not support Dr. Blanton's diagnosis of memory loss. (R. 38).

Sixth, the ALJ concluded that the claimant was incapable of returning to his previous work as a pest control technician and security guard. The ALJ relied on the claimant's residual functional capacity, age, education, and work experience, as well as the vocational expert's

testimony to establish alternate jobs the claimant could perform.  As previously stated, the vocational expert testified that, given all of the factors, the individual could perform the occupations of "vegetable harvester," any jobs in the fields of "laundry," "housekeeper," and "product assembler."  The vocational expert testified the jobs were available in significant numbers both regionally and nationally.  (R. 39).  Accordingly, the ALJ concluded that the claimant did not have a disability under the Social Security Act.  (R. 40).

## VI. DISCUSSION

### A. Weight Given to Psychological Examiners, Dr. Blotcky and Dr. Blanton:

The claimant argues that the ALJ did not give proper weight to the opinions of Alan Blotcky, Ph.D. and Donald Blanton, Ph.D.  To the contrary, this court finds the ALJ properly articulated his reasons, and that substantial evidence supports the weight the ALJ gave to the medical opinions.

The ALJ may reject the opinion of *any* physician when the evidence supports a contrary conclusion. *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (emphasis added). Even though the ALJ must consider all medical opinions, he does not have to accord an opinion arising out of a single consultative examination the special deference he must give to a treating physician's opinion.  *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997).

The ALJ gave "little weight" to the opinion of Dr. Blotcky.  In support of his conclusion, the ALJ noted that the claimant's subjective complaints of both mental and physical symptoms varied greatly between his January 2011 examination with Dr. Sanders and his February 2011 examination with Dr. Blotcky.  The ALJ acknowledged that Dr. Blotcky's findings relied heavily on the claimant's own subjective complaints.  After noting the claimant did not exhibit those

17

traits during his January 2011 examination or during contact with the State agency in March
2011, the ALJ deemed Dr. Blotcky's examination findings inconsistent with the claimant's
normal presentation reflected in the rest of the record.  Based on these inconsistencies, the ALJ
gave Dr. Blotcky's opinion "little weight."   (R. 37).

The ALJ gave "less weight" to the evaluation of Dr. Blanton.  The ALJ noted that the
claimant did not receive testing for memory problems and only reported such problems with his
memory during his psychological evaluation with Dr. Blanton.  The ALJ relied on the fact that
Dr. Blanton's findings were not supported by brain CT scans, MRIs, or specific
neuropsychological testing.  The ALJ concluded that the objective medical evidence did not
support Dr. Blanton's diagnosis of memory loss.  (R. 38).  As such, an ALJ may give less weight
to a medical opinion that is not supported by medical evidence.  20 C.F.R. § 416.927.

Based on the ALJ's explicit statement of his reasons grounded in the record for giving little
weight to Dr. Blotcky's opinion and less weight to Dr. Blanton's opinion, this court concludes
that the ALJ correctly applied the legal standard and that substantial evidence supports his
decision.

## B. Application of the Eleventh Circuit's Pain Standard:

The claimant argues that the ALJ improperly applied the Eleventh Circuit's pain standard,
by finding the claimant's subjective claims not credible.  To the contrary, as explained below,
this court finds that the ALJ properly applied the pain standard and that substantial evidence
supports his decision.

In evaluating pain and other subjective complaints, the Commissioner must consider
whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective

18

medical evidence that confirms the severity of the alleged pain arising from that condition or (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added).  While the ALJ must articulate reasons for discrediting the claimant's subjective testimony, he may consider a claimant's daily activities in evaluating and discrediting complaints of disabling pain. *Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991); *Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984).

In support of finding that the claimant's subjective claims were not credible, the ALJ noted that the claimant alleged suffering back pain for many years, yet he continued to work as a security guard, a job requiring at least medium exertional work, for years after the alleged suffering began.

The ALJ found that the claimant's symptom reports varied with inconsistent reports made to his treating sources and the consultative examiners.  Specifically, during a consultative examination on January 22, 2011 with Dr. Sanders, the claimant complained of suffering memory problems, but did not report those symptoms during a psychological examination just a few weeks later. The ALJ noted that the claimant never reported memory problems to his treating physician and never sought out neuropsychological testing or other testing for Alzheimer's or dementia.

Furthermore, the ALJ noted that the claimant's reports regarding his work activity were greatly inconsistent.  The claimant reported to Dr. Sanders that he stopped working in 2007, and reported to Dr. Blotcky that he stopped working in 2004, but records show he worked until 2008. The claimant reported to Dr. Sanders that he quit working because of stress, but he told Dr.

Blotcky he was fired from his job.  During the hearing, the claimant initially testified that he quit working because of PTSD like symptoms caused by seeing dead children, body parts, and other traumatic things at work.  The claimant later testified that he was fired after having problems with his supervisors.

 The record further reflects that the claimant reported significant symptoms of depression and anxiety to his consultative examiners and during the hearing, but he did not report symptoms of the same disabling severity to his treating physician.  While the claimant did report certain symptoms to his treating physicians (like the inability to concentrate), the physician attributed those symptoms to uncontrolled ADD and the loss of the claimant's job.  Consequently, the ALJ determined that the inconsistences between the medical record, the claimant's allegations, and the claimant's testimony severely undermined the claimant's credibility.

Based on the ALJ's explicit statement of his reasons grounded in the record for discrediting the claimant's statements, this court concludes that the ALJ correctly applied the legal standard and that substantial evidence supports his decision.

## VII. CONCLUSION

For the reasons stated above, this court concludes that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 8th day of March, 2016.

_Karon O. Bowdre_
_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE